UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

AIG EUROPE, S.A., as assignee and/or
  subrogee of Luvata Buffalo, Inc., Luvata Oy
    f/k/a Luvata Holding Oy and Luvata
  International Oy and

LUVATA BUFFALO, INC.,

                              Plaintiffs,

                                                    **DECISION AND ORDER**
                                                    09-CV-612A

        v.

MIH SCRAP METALS
  INTERNATIONAL, LLC et al.,

                              Defendants.

## I.    INTRODUCTION

        Pending before the Court are motions to dismiss by defendants MIH Scrap

Metals International, LLC, and MIH Cathode Trading, LLC ("MIH" collectively);

and by defendants Intertek Group PLC, Intertek Agri Services, Intertek Caleb

Brett, Intertek Testing Services, and Intertek Testing Services (East Africa) (Pty)

Ltd. ("Intertek" collectively).[1]  Intertek seeks dismissal from the case for reasons

_____

    [1] The Court grants Intertek's motion (Dkt. No 27) to amend its motion to
dismiss, and will consider the amended motion (Dkt. No. 31) as having
superseded the original motion (Dkt. No. 9).  The amendments have caused no
prejudice to plaintiffs since they had not responded to the original motion when
the amended motion was filed.

including a lack of subject-matter jurisdiction, *forum non conveniens*, and a lack of specificity in the fraud and negligent-misrepresentation allegations against it. Both Intertek and MIH have asserted that this Court lacks personal jurisdiction over them. Plaintiffs AIG Europe, S.A. ("AIG") and Luvata Buffalo, Inc. ("Luvata") respond that their respective complaints are sufficiently specific to preserve their claims and their choice of forum. The Court held oral argument on June 24, 2010. For the reasons below, the Court will deny the motions.

## II.    BACKGROUND[2]

This case concerns plaintiffs' attempt to determine how a shipment certified in Tanzania as 500 metric tons of industrially pure copper became a shipment of worthless rocks, sand, and debris by the time it approached its final destination in Buffalo. Plaintiff Luvata is a Delaware corporation with its principal place of business in Buffalo, New York. On or around March 20, 2007, Luvata entered a contract with MIH for 1,500 metric tons of 99.99% pure copper cathodes. The contract specified that Intertek would inspect any shipments under the contract, certify that any shipping containers used contained pure copper, and seal the containers to allow Luvata to know whether any containers had been tampered post-inspection.

---

[2] Because plaintiffs' allegations must be taken as true for purposes of the pending motions, the Court here will avoid repeated use of the word "alleged."

Sometime after Luvata and MIH signed the contract, they arranged for a shipment of the first 500 metric tons of copper. Meanwhile, Luvata took out an insurance policy from AIG that would cover any losses sustained in connection with the shipment, including losses resulting from criminal theft or fraud. On or about July 21, 2007, Intertek transmitted to Luvata a survey report confirming an inspection of that shipment and providing details of the inspection. Relying on that survey report and various documents from MIH, Luvata transmitted to MIH a payment for the shipment that exceeded $3.7 million. Throughout the pendency of the transaction, the parties exchanged e-mail messages concerning the status of the shipment.

The shipment of copper cathodes traveled from its loading in Tanzania to Montreal and then Toronto. The shipment traveled in the form of 25 numbered shipping containers, with seals from Intertek that bore their own numbers. All 25 containers arrived in Toronto without any evidence of tampering. The container and seal numbers on the containers matched the numbers listed in the survey report and shipping documents. Once the containers arrived in Toronto, a sample of four containers were transported to their final destination at the Luvata's facility in Buffalo. Luvata opened these four containers and found, to its surprise, that the containers held no copper at all. Instead, these four containers contained worthless rocks, sand, and debris. Meanwhile, United States customs agents stopped and rejected the next four containers that were making their way

from Toronto to Buffalo, because they too were found to contain worthless materials and no copper. Luvata arranged for an inspection of the remaining 17 containers still in Toronto. None of those containers held any copper. Luvata submitted a claim to AIG under the policy that it purchased to cover the shipment. AIG reimbursed Luvata in full. On or about September 19, 2008, Luvata assigned its rights relating to its loss to AIG, thereby giving AIG subrogation rights.

AIG and Luvata subsequently filed essentially identical complaints on July 1, 2009 and February 16, 2010. Plaintiffs have asserted seven claims against MIH and five against Intertek, accusing each of breach of contract, fraud, and negligent misrepresentation. In short, plaintiffs have alleged that MIH and Intertek never intended to fill the shipping containers with copper and knew from the beginning of the transaction that the containers would hold no copper, but pretended otherwise to induce payment from Luvata.

On October 5, 2009, MIH filed a motion to dismiss for lack of personal jurisdiction (Dkt. No. 18). In support of this motion, MIH asserts that it has no offices, bank accounts, or regular clients in New York, meaning that it has no continuous or systematic course of doing business in New York within the meaning of New York's rules for "long-arm" personal jurisdiction. MIH asserts further that it does not have an ongoing contractual relationship with Luvata, and neither negotiated the contract in New York nor traveled to New York to meet with

Luvata to form the contract.  In opposition to this motion, plaintiffs assert that MIH did have an ongoing business relationship with Luvata because it knew that this first shipment of 500 metric tons was destined for Buffalo and because it knew that the remaining 1,000 metric tons would be delivered to Buffalo at some future time.  Plaintiffs assert further that MIH has engaged in tortious conduct that caused damages within New York.

On January 6, 2010, Intertek filed an amended motion to dismiss on multiple grounds (Dkt. No. 31).  Intertek has made an argument about a lack of personal jurisdiction that is essentially identical to the argument that MIH made.  Additionally, Intertek asserts that its inspection contract limits its maximum liability, and thus the maximum amount in controversy concerning it, to under $20,000 in U.S. currency, well below the $75,000 threshold needed for diversity cases.  Intertek seeks dismissal as against certain "service lines" named as defendants in plaintiffs' complaints because they are not actual entities that can be sued.  Intertek also seeks dismissal under the doctrine of *forum non conveniens*, claiming that litigating in Buffalo is inconvenient compared to Tanzania, where the shipment was loaded, or England, a forum selected by Intertek and a third party allegedly acting on Luvata's behalf.  Finally, Intertek seeks dismissal of the fraud and negligent misrepresentation claims against it for lack of particularity.  In short, plaintiffs respond to these arguments by asserting that Intertek and Luvata negotiated and communicated directly with each other for

a shipment that Intertek knew would arrive in Buffalo.  Plaintiffs assert further that their complaints set forth a detailed theory of fraud in which the only allegations made upon information and belief concern details that currently lie within Intertek's exclusive control.

## III.    DISCUSSION

MIH and Intertek have made several arguments for dismissal.  Each argument requires a different analysis.  To the extent, however, that the arguments require an assessment of the allegations in plaintiffs' complaint, the Court will proceed through each argument by "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted).

### A.    *MIH's Motion to Dismiss for Lack of Personal Jurisdiction*

"In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway.  It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion.  If the court chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials.  Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary

6

hearing or at trial.  But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (citations omitted).  Here, the parties have not requested an evidentiary hearing regarding personal jurisdiction over MIH.  The parties instead have chosen to submit extensive briefing with exhibits.  The papers now in the docket suffice to determine whether plaintiffs have at least made a prima facie showing that this Court has personal jurisdiction over MIH.  *Cf. Parker Waichman Alonso LLP v. Orlando Firm, P.C.*, No. 09 Civ. 7401, 2010 WL 1956871, at *5 (S.D.N.Y. May 14, 2010) ("Because personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . all pertinent documentation submitted by the parties may be considered in deciding the motion.") (internal quotation marks and citations omitted).  Consequently, the Court will assess MIH's motion using that standard.

"District courts resolving issues of personal jurisdiction must . . . engage in a two-part analysis.  First, a district court must determine whether, under the laws of the forum state (New York in this case), there is jurisdiction over the defendant. Second, [it] must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (alterations in original) (internal quotation marks and citations omitted).

1. *Laws of the Forum State*

Federal Rule of Civil Procedure ("FRCP") 4(h), by way of FRCP 4(e)(1), allowed plaintiffs to serve MIH "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." That rule allows for the use of N.Y. CPLR 302(a), which permits plaintiffs to establish "long-arm" jurisdiction in any of four different ways, two of which are relevant to this case:

(1)     Establishing that MIH "transacts any business within the state or contracts anywhere to supply goods or services in the state," CPLR 302(a)(1); or

(2)     Establishing that MIH "commits a tortious act without the state causing injury to person or property within the state . . . if [it] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce," CPLR 302(a)(3).

"By this 'single act statute' . . . proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial

relationship between the transaction and the claim asserted." *Deutsche Bank Secs., Inc. v. Montana Bd. of Invs.*, 850 N.E.2d 1140, 1142 (N.Y. 2006) (internal quotation marks and citation omitted).

Here, MIH entered a contract with Luvata whose first page lists the buyer as "Luvata Buffalo, Inc.," "whose appointed domicilium is 70 Sayre Street, Buffalo, NY 14240, USA." (Dkt. No. 1-2 at 2; Dkt. No. 50-2 at 2.) Under the contract, MIH was to contact Luvata directly to provide a market price for the copper. (Dkt. No. 1-2 at 3; Dkt. No. 50-2 at 3.) MIH corresponded directly with Luvata on numerous occasions concerning the copper purchase. (*See* Dkt. No. 50-4 at 2–3; Dkt. No. 50-5 at 2; Dkt. No 50-6; Dkt. No. 50-7; Dkt. No. 50-8; Dkt. No. 50-9; Dkt. No. 50-10.) The final invoice from MIH, bearing MIH letterhead, explicitly lists Luvata as the buyer and lists a Buffalo mailing address. (Dkt. No. 50-7 at 7–9.) Luvata paid that invoice with Purchase Order No. 30077. (Dkt. No. 54-3 at 7.) Regardless of whether third-party intermediaries helped with the logistics necessary to bring the copper shipment to Buffalo, the evidence available in the docket makes obvious that MIH and Luvata communicated directly with each other at all stages of the purchase. Throughout those communications, MIH obviously knew that Luvata was the buyer, that Luvata was located in Buffalo, and that Luvata wanted the copper to arrive ultimately where it was located—in Buffalo. The evidence also implies that MIH and Luvata would have had to continue their communications in the future, because 1,000 metric

tons of copper still needed to be shipped. Under these circumstances, plaintiffs have made a prima facie showing that MIH contracted to supply goods within New York's borders, within the meaning of CPLR 302(a)(1). *Cf. Deutsche Bank Secs.*, 850 N.E.2d at 1143 ("[Defendant] is a sophisticated institutional trader that entered New York to transact business here by knowingly initiating and pursuing a negotiation with [plaintiff's] employee in New York that culminated in the sale of $15 million in bonds. Negotiating substantial transactions such as this one was a major aspect of [defendant's] mission—'part of its principal reason for being.'") (citation omitted). Additionally, and accepting the allegations in the complaint as true, MIH's failure to load the shipping containers with the contractually agreed-to product injured Luvata and its operations in Buffalo, within the meaning of CPLR 302(a)(3). Plaintiffs thus have made a prima facie showing of personal jurisdiction under New York law.

## 2. *Federal Due Process Requirements*

With respect to the requirements for personal jurisdiction under the Due Process Clause of the Fourteenth Amendment, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (citation omitted). "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Id.* at 476 n.18 (citation omitted). "Although territorial presence frequently will enhance a potential defendant's

affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.  So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 476 (citations omitted).

Here, MIH contracted with Luvata specifically to bring 1,500 metric tons of copper to Buffalo.  The shipment of one-third of that copper cost almost $4 million, with, presumably, two shipments and two similar payments to follow in the future.  MIH communicated with Luvata throughout the pendency of the first shipment—communicated enough, in fact, to induce Luvata to transmit payment and to think that the shipment would arrive as certified.  MIH would have to continue communicating with Luvata over the course of several months or several years regarding the delivery to Buffalo of the remaining 1,000 metric tons specified in the contract.  This evidence suffices for a prima facie showing that MIH purposefully directed significant commercial efforts toward New York so as to satisfy the Due Process Clause.  Subject to an ultimate resolution of the issue at trial, the Court will assert personal jurisdiction over MIH and deny MIH's motion to dismiss.

**B.** *Intertek's Motions to Dismiss*

Intertek's motion contains five[3] separate arguments for dismissal. The Court will address each argument separately, but will address the argument about subject-matter jurisdiction first. "Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (internal quotation marks and citations omitted).

      1.    *Lack of Subject-Matter Jurisdiction*

"The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty,

---

[3] Intertek withdrew a sixth argument asserting insufficient service of process. (Dkt. No. 27 ¶ 3.)

that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938). Here, Intertek asserts that it received an inspection fee equivalent to $1,180, and that its inspection contract limits its liability to 15 times the amount of its inspection fee. The complaint alleges, *inter alia*, that Intertek is liable for the entire $3.7 million of loss claimed because it fraudulently induced Luvata to make that payment through a false survey report and other inspection documents. Fraudulent inducement is a legally cognizable claim, and Intertek has not suggested otherwise. The evidence available so far indicates that Intertek certified and sealed shipping containers containing copper, that those containers arrived in Toronto untampered, and that the containers held worthless rocks, sand, and debris when opened. Whether plaintiffs can prove at trial by a preponderance of the evidence that Intertek's inspection was fraudulent will become more apparent at the close of discovery. Plaintiffs' likelihood of success currently, however, cannot be assessed as a matter of law, so as to fulfill the requirement that the "legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim." *Scherer v. Equitable Life Assurance Soc'y*, 347 F.3d 394, 397 (2d Cir. 2003) (internal quotation marks and citations omitted).

Consequently, the amount in controversy asserted against Intertek in the complaint controls, and the Court rejects this Intertek argument.

2.    *Lack of Personal Jurisdiction*

The two-part legal standard governing Intertek's argument about personal jurisdiction is the same standard that the Court cited above for MIH's motion.  For the sake of brevity, that standard is incorporated into this section by reference.

Here, Intertek prepared a survey report asserting that it attended the loading and 10% weighing of the copper shipment.  (Dkt. No. 1-4; Dkt. No. 54-2.)  The first page of that report explicitly lists the recipient of the report as Luvata at 70 Sayre Street in Buffalo.  Among any other companies that perform inspection services, Intertek was chosen by MIH and Luvata themselves, as Section 4.1 of the MIH-Luvata contract states explicitly.  (Dkt. No. 1-2 at 4; Dkt. No. 50-2 at 4; Dkt. No. 54-3 at 4.)  During the pendency of the copper purchase, Intertek communicated with Luvata directly by email.  (*See* Dkt. No. 54-5; Dkt. No. 54-6.)  This information indicates that Intertek knew from the beginning of the transaction that Luvata was the buyer, that Luvata was located in Buffalo, that Luvata picked it to inspect the copper, and that Luvata had to send its survey report to Luvata in Buffalo.  Intertek would have continued to communicate with Luvata and to provide inspection services in subsequent months and years for the 1,000 metric tons of copper not addressed by the shipment in question.  Under these circumstances, plaintiffs have made a prima facie showing that Intertek

contracted to supply services within New York's borders, within the meaning of CPLR 302(a)(1). Additionally, and accepting the allegations in the complaint as true, Intertek's false survey report injured Luvata and its operations in Buffalo, within the meaning of CPLR 302(a)(3). Finally, Intertek's long-term relationship and communications with Luvata suffices for a prima facie showing of purposeful activity in New York that satisfies federal due-process requirements. Subject to an ultimate resolution of the issue at trial, the Court will assert personal jurisdiction over Intertek and reject this Intertek argument.

### 3. *Lack of Capacity to Be Sued*

Intertek seeks dismissal against the named defendants Intertek Caleb Brett, Intertek Agri Services, and Intertek Testing Services on the grounds that they are neither individuals nor organizational entities, but rather mere trademarks or "service lines." In effect, Intertek is asserting that these named defendants are intangible, inanimate objects. If so then the Court trusts the parties to stipulate to an amendment of the caption upon appropriate confirmation, without the need for a ruling. The Court thus rejects this Intertek argument without prejudice to renew at the close of discovery if the issue remains in dispute.

### 4. *Forum Non Conveniens*

"We regard the Supreme Court's instructions that (1) a plaintiff's choice of her home forum should be given great deference, while (2) a foreign resident's

choice of a U.S. forum should receive less consideration, as representing consistent applications of a broader principle under which the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations . . . . Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71–72 (2d Cir. 2001). Plaintiffs chose this District as the forum for their litigation because Luvata is located here, the copper shipment was supposed to arrive here, and Intertek knew that. Intertek communicated with Luvata in Buffalo throughout the pendency of the transaction. Intertek would have had to continue its connections to Buffalo when inspecting and certifying the 1,000 metric tons of copper that would have been delivered at a future time. Any discovery and witnesses from Luvata are located in Buffalo. Any discovery and witnesses related to the arrival of the shipment in Montreal and Toronto are available only a short distance from Buffalo. Documents from Intertek can be exchanged electronically if necessary. Depositions of witnesses abroad could occur by live videoconference or by taped video, which then could be played at trial. *Cf. DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) ("While demeanor evidence is important when trying a fraud case before a jury,

videotaped depositions, obtained through letters rogatory, could afford the jury an opportunity to assess the credibility of these [foreign] witnesses.") (citation omitted).  In short, Intertek has not shown that preparing for trial in the city where one of its customers operated and received its services would be so inconvenient that the Court should disturb plaintiffs' choice of forum.  The Court thus rejects this Intertek argument.

     5.    *Lack of Particularity in the Eighth and Twelve Claims*

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FRCP 9(b).  "A complaint of fraud satisfies Rule 9(b) if it sets forth who made the fraudulent statements, the dates and places at which the alleged fraudulent statements were made, the manner in which the statements were false and upon which statements plaintiffs relied.  Plaintiffs need not, at this stage, plead scienter with great specificity, and conclusory allegations of scienter are adequate where a complaint provides a minimal factual basis that gives rise to a strong inference of fraudulent intent.  This 'strong inference' may be demonstrated by showing that defendants had a motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior.  When assessing the specificity of a fraud complaint, the reviewing court should read the complaint liberally, drawing all inferences in favor of the non-moving party."  *M & T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405, 412

(E.D.N.Y. 2004) (citations omitted).  "Despite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.  This exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard."  *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (citations omitted).

Here, plaintiffs have made the following allegations in their complaint:

(1)     "Intertek agreed to perform a quality and quantity pre-inspection of the subject copper cathodes shipment prior to transit, and to seal each container stuffed with copper cathodes to be loaded on board the vessel, the Jade Trader."  (Dkt. No. 1 ¶ 27; Dkt. No. 36 ¶ 23.)

(2)     "Intertek provided an inspection report and related documents to Luvata—certifying that the quality and quantity of the goods loaded into the shipping containers was 500 metric tons of copper cathodes and certifying that each of those containers was sealed and loaded and/or to be transported for loading on board the vessel, the Jade Trader."  (Dkt. No. 1 ¶ 28; Dkt. No. 36 ¶ 24.)

(3)     "Despite their certifications and reports provided as part of their inspection services to Luvata (and upon which Intertek intended

18

Luvata to rely) guarantying to Luvata that '500.80' metric tons of 'copper cathodes' were stuffed and sealed into shipping containers and loaded at the port of Dar es Salaam, Tanzania for transit on the ocean vessel, the 'Jade Trader,' to Luvata, each and every shipping container—with the same container numbers as Intertek had certified to Luvata contained copper cathodes—held absolutely no copper upon delivery to Luvata in Buffalo, New York, but rather held worthless minerals or rocks."  (Dkt. No. 1 ¶ 29; Dkt. No. 36 ¶ 25.)

(4)     "Pursuant to the Contract, Intertek was to: inspect the copper cathodes to be 'stuffed' (i.e., loaded into shipping containers); seal the containers; and certify same to Luvata."  (Dkt. No. 1 ¶ 42; Dkt. No. 36 ¶ 38.)

(5)     "By the Intertek certifications and reports dated July 21, 2007, Intertek represented, certified and/or guaranteed to Luvata that: Intertek 'did attend Loading and 10% Weighing of Copper Cathodes . . . between 16th and 19th July, 2007'; Intertek 'did attend . . . on 18th and 19th July, 2007' the 'Loading/Tallying of Copper cathodes into containers' finding '25' shipping containers were loaded with '500.80' metric tons of 'copper cathodes'; Intertek 'did attend . . . on 18th and 19th July, 2007' for purpose of 'Witnessing 10% Weighing, Supervising Loading and Sealing of Containers loaded with Copper

cathodes into containers' finding '25' shipping containers with separate container numbers held '500.80' metric tons of 'copper cathodes' that were sealed with both 'Intertek Seals' and 'Shipping Seals' and/or were loaded at the port of Dar es Salaam, Tanzania for transit on the ocean vessel, the 'Jade Trader,' to Luvata."  (Dkt. No. 1 ¶ 50; Dkt. No. 36 ¶ 46.)

(6)     "Despite their certifications and reports provided as part of their professional inspection services to Luvata (and upon which Intertek intended Luvata to rely) guarantying to Luvata that '500.80' metric tons of 'copper cathodes' were stuffed and sealed into shipping containers and loaded at the port of Dar es Salaam, Tanzania for transit on the vessel, the 'Jade Trader,' each and every shipping container—with the same container numbers as Intertek had certified to Luvata contained copper cathodes—held absolutely no copper upon delivery to or discovery by Luvata in Buffalo, New York, but rather held worthless minerals or rocks."  (Dkt. No. 1 ¶ 64; Dkt. No. 36 ¶ 61.)

These allegations were *not* pled upon information and belief.  Together, they establish a comprehensive allegation that Intertek signed a survey report that induced Luvata to make payment, knowing that Luvata would not receive any

copper and knowing that Luvata would make payment anyway in reliance on Intertek's survey report.

At this point, plaintiffs are missing only the details concerning who within Intertek may have said what to whom.  To that end, plaintiffs have alleged upon information and belief that Hilliard Potua signed the survey report, which appears to be true from the face of the survey report.  The survey report does not state who performed the inspection or who completed the report.  Plaintiffs communicated by email with only Hilliard Potua.  Plaintiffs would not know from those communications or from the survey report how many other Intertek officials or employees played a role in the inspection and sealing.  That information, currently, is within Intertek's exclusive control and does not detract from the specific allegation that Intertek, as an artificial corporate person, made a statement on July 21, 2007 to Luvata in the form of a survey report that was fictitious and fraudulent.  Under these circumstances, the complaint contains sufficient particularity to put Intertek on notice as to what plaintiffs mean in their eighth and twelfth claims, thereby satisfying the requirements of FRCP 9(b).  The Court thus rejects this Intertek argument.

IV. **CONCLUSION**

For all of the foregoing reasons, the Court:

(1)     Grants Intertek's motion to amend its motion to dismiss (Dkt. No. 27) and denies its original motion to dismiss (Dkt. No. 9) as superseded;

(2)     Denies Intertek's amended motion to dismiss (Dkt. No. 31); and

(2)     Denies MIH's motion to dismiss (Dkt. No. 18).

The Intertek and MIH defendants shall answer the complaint within 20 days of entry of this Order.

SO ORDERED.

_s/ Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: July 6, 2010